IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:11-00083-15 |
| ) | Chief Judge Haynes |
| CARLOS ANTWAN FLETCHER, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

The United States filed this action against the Defendant Carlos Antwan Fletcher and others with charges of conspiracy to engage in drug trafficking and the possession as well as brandishing of a firearm in furtherance of the drug conspiracy.

Before the Court is the Defendant's motions to suppress (Docket Nos. 211, 385 and 441) contending, in sum, that the Government agents improperly seized evidence from his residence and during the search of his residence the agents obtained incriminating responses from him without Miranda[1] warnings. Thus, the Defendant seeks suppression of all evidence obtained as the results of the search of his residence and his arrest. In opposition, the Government contends, in essence: (1) that the search of the Defendant's residence was pursuant to a warrant based upon probable cause; (2) that the agent's questions of the Defendant were on the scene questioning about his residence that is permissible under Miranda; (3) that the Defendant's statements about weapons at the residence and his ownership of drugs were voluntary; and (4) that the Defendant reiterated his possession of drugs after his arrest and Miranda warning.

### A. Review of the Record

---

[1] Miranda v. Arizona, 384 U.S. 436, 478-79 (1966).

On April 14, 2011, Magistrate Judge E. Clifton Knowles issued a search warrant for the Defendant's residence 1225 Kermit Drive, Nashville, Tennessee based upon the affidavit of Kenneth M. Powers, a Task Force Officer in the Drug Enforcement Administration. Powers's lengthy affidavit detailed a federal investigation since June 2010 that included intercepted telephone calls pursuant to court-authorized Title III wiretaps as well as DEA agents' physical surveillance and information from a confidential source, a key person in a major drug conspiracy. Identical affidavits were submitted for eight other premises identified in this investigation. Judge Knowles previously issued search warrants for all nine Target Premises on April 3, 2011, but the warrants were returned unexecuted because the ten-day period to execute them had expired. Powers's affidavit includes the statement: "Based upon the ongoing interceptions over two telephones used by two targets of the investigation, your Affiant believes the crimes being investigated remain ongoing." (Docket Entry No. 413-1, Powers Affidavit at 8).

### 1. The DEA Investigation

At the end of June 2010, a confidential source ("CS-1") was arrested for possession of a kilogram of cocaine and "agreed to cooperate in the hopes of not being prosecuted and has since been an FBI cooperating source." Id. CS-1 "admitted to FBI agents that he/she had transported a load of forty kilograms of cocaine from Atlanta, Georgia to Nashville, Tennessee at request of Zeeshan Khalid Syed, aka 'Sunny,'" the lead defendant in this action. Id. at 12. CS-1 told agents that Syed had been directing "the distribution of kilogram quantities of cocaine since at least early 2007." Id.

CS-1 also told DEA agents that co-defendants Mario Gonzalez and Daniel Medina received kilograms cocaine shipments from Mexico that Gonzalez delivered to Syed for the

Nashville area. Id. According to CS-1, Syed also receives shipments of cocaine from co-defendant Aldo Villarreal. For nine months, at Defendant's Syed's request, CS-1 counted the proceeds of drug sales at Target Premises 5, and "the amount of drug proceeds initially ranged from $75,000-$150,000 each time and increased to approximately $300,000," with as much as $500,000 counted on one occasion. Id. at 12-13.

Based upon independently corroborated information, Powell deemed CS-1 reliable and credible citing CS-1's "making recorded phone calls at the direction of and witnessed by Agents, surveillance by Agents, and the content of intercepted calls over seven court-authorized wiretaps." Id. Based on that information, DEA agents commenced their investigation of the Defendants.

Beginning on or about June 29, 2010, the agents investigated multiple suspects and multiple locations, including the Defendant's residence. Id. at 12. The Honorable Chief Judge Todd J. Campbell issued seven Title III wiretaps on telephones tied to co-defendants Gonzalez, Medina, Syed and Rodney Reed. Id. at 10-11. Over a six month period beginning in November 2010, agents intercepted these telephone calls. Judge Campbell later approved several extensions on the Title III wiretaps, and telephone calls between Reed and Syed up to April 18, 2011. Id. The ongoing intercepted telephone calls between Reed and Syed led Powers to believe that "the crimes being investigated [were] ongoing." Id. at 8.

On multiple occasions, DEA agents physically observed the target suspects at the nine different Target Premises, including the Defendant's residence. The agents concluded that Syed was a "multi-kilogram cocaine and marijuana distributor in the Nashville, Tennessee area," and that Rodney Reed received those drugs from Syed to distribute to Reed's customers. Id. at 9. The

agents observed Reed's high level involvement in drug trafficking throughout their investigation. Reed was repeatedly seen at the Defendant's residence that agents viewed as one of several stash houses of drugs in the Nashville area. Of Reed's observed activities was on June 28, 2010, trip by CS-1 to Atlanta, Georgia, at Syed's request to pick up forty kilograms of cocaine. Id. at 13-14. When CS-1 picked up the cocaine, Syed told CS-1 to deliver the cocaine to Reed who took the delivery at Target Premises 3. Id.

On September 8, 2010, Syed asked CS-1 to borrow his gold Lexus SUV that CS-1 believed was for Syed's travel to Atlanta to "oversee the transportation of cocaine back to Nashville." Id. at 14. Two days later, DEA agents physically observed Syed in Atlanta driving this Lexus SUV that was closely followed by a white Mercedes Benz. Id. Agents followed Syed and the two vehicles to Nashville to Target Premises 7. Id. An hour later, Reed arrived at Target Premises 7 and took possession of the Mercedes Benz. Id. Surveillance was unable to follow Reed due to Reed's counter surveillance maneuvers. Id. at 15.

On December 14, 2010, "a series of calls were intercepted in which Syed directed Reed to collect drug proceeds and drop them off to an unidentified male." Id. Later that day, DEA agents intercepted telephone calls in which "Syed instructed Reed to meet with associates of Gonzalez to offload approximately 3-4 kilograms of cocaine from a concealed compartment in their vehicle." Id. at 15-16. Agents then observed Reed, Gonzalez and his associates "in the vicinity of Target Premises 3." Id. at 16. "Calls were then intercepted in which Gonzalez' associates identify a surveillance vehicle." Id. Syed immediately contacted Reed who began driving through the neighborhood around Target Premises 3 "in an attempt to locate the surveillance vehicle." Reed eventually told Syed "that he will take Gonzalez's associates to a

4

different stash house where they would be safer." Id.

On December 22, 2010, intercepted calls revealed that "money was being collected by Reed and given to unidentified carriers to take it back to Mexico." Id. DEA agents physically observed Reed leave Target Premises 2 in a silver Pontiac and later meet a driver of a gold Chevrolet Suburban bearing a Mexico license plate. Id. Agents had previously associated this Chevrolet Suburban vehicle with Gonzalez, one of Syed's suppliers. Id. Reed and the driver of the Suburban then went to Target Premises 1, where after an hour, the garage door opened, and agents observed Reed's Pontiac and the Suburban with Mexico tags enter. Id. Shortly thereafter, a Tennessee highway patrol trooper conducted a traffic stop of the Suburban, and "found a hidden compartment inside the Suburban that contained $83,432," that agents believed to be "collected drug proceeds from cocaine sales from Syed and Reed." Id. at 16-17.

On February 23, 2011, agents physically observed Reed at Target Premises 1 and intercepted a telephone call in which an unidentified male asked Reed for "some purp," and "some little knock down ... something that real strong," that agents interpreted to be marijuana. Id. at 18. This person then asked "if Reed could bring it with him when he came to meet the unidentified male." Id. "Reed agreed, stating 'I'm right here waiting now.'" Id. Agents then followed Reed, who was driving a rental car, to a Shell gasoline station where Reed met with the unidentified male. Id.

On February 28, 2011, agents intercepted a series of telephone calls between Reed and Syed who "discuss[ed] money owed to Syed's sources of supply." Id. at 18-19. During these calls, Syed told Reed "that's good. Get everything done, man. Get them off my back," and later stated, "everybody wants their money before they give you anything..." Id. at 19. Two and a

half hours later, in another telephone call, Reed told Syed, "let me get everything together. Call you in a hot second." Id. Less than an hour later, in another telephone call, Reed told Syed that he would meet with co-defendant Maurice Ferguson before meeting Syed. Id. A half an hour later, Reed told Syed in a telephone conversation that he was in route to meet Syed, and DEA surveillance "confirmed that Reed and Syed then met at Target Premises 7." Id.

On March 13, 2011, DEA agents intercepted a telephone call in which an unidentified male told Reed that "he wanted to meet with him in about one and a half to two hours to give him money." Id. at 20. About an hour later, agents observed Reed leave Target Premises 6. Id. About two hours after the initial call, another call was intercepted in which "Reed told the unidentified male that Reed would bring the unidentified male 'some more.'" Id. An hour later, Reed drove to Target Premises 2, and shortly thereafter, drove to a Home Depot. Id.

On March 21, 2011, intercepted calls reflected that "Reed was going to meet an unidentified female at a shopping center." Id. at 22. Agents followed Reed to a shopping center off of Charlotte Pike, where they observed Reed "going into the trunk of area of the vehicle [he was driving], removing several brown packages, and placing them in his pants." Id. Agents then saw Reed enter into a silver Chrysler in the parking lot, and then exit the Chrysler moments later. Id. Agents then observed an unidentified female exit the Chrysler and put brown packages in the trunk of the vehicle. Id. Later that evening, DEA agents intercepted a telephone call in which "the unidentified female told Reed that she had shorted him 'five dollars.'" Id.

On March 22, 2011, a series of intercepted telephone calls revealed that Syed wanted to meet with Reed, Ferguson, and Villarreal in person "to discuss drug debts owed to Villarreal." Id. at 23. "Surveillance confirmed this meeting took place at Target Premises 5 at approximately

6

10:25 p.m." Id.

On March 25, 2011, CS-1 told agents to watch for the white Mercedez Benz, "and that Gonzalez had just transferred approximately ten kilograms of cocaine to Reed at a Kmart parking lot . . ." Id. "Shortly thereafter, agents observed the white Mercedes Benz depart the garage area of Target Premises 3, [and] [a]n African-American male, who fit the same physical description of Reed, exited the vehicle and . . . upon closing the garage door, . . . exited the driveway." Id. Twenty minutes later, agents observed the white Mercedes Benz pull into the garage of Target Premises 1, where Reed's gold Tahoe was already parked, and the garage door shut behind the cars. Id.

CS-1 also told DEA agents that "Gonzalez was going to meet with Reed to check the quality of the cocaine." Id. at 24. Intercepted telephone calls confirmed this information, and also revealed that Reed was to deliver kilograms of cocaine to Ferguson. Id. Agents then watched "Reed leave in Gonzalez'[s] vehicle, travel to a local Walgreen's Pharmacy and purchase gallon-size baggies," which in Powell's experience, are frequently used to "package kilogram levels of cocaine. . ." Id. Reed then returned to Target Premises 1, and later that day, agents observed Reed drive and conduct counter-surveillance measures with the white Mercedes Benz, but eventually drove to Target Premises 1 to Target Premises 5, a property associated with Ferguson. Id. at 24-25. Intercepted telephone calls revealed that, during this time, "Reed was instructing Ferguson to direct someone to open the bay door for Reed." Id. at 25. Reed remained at Target Premises 5 for three to five minutes before leaving. Id. Twenty minutes later, agents saw that a blue Tahoe pulled into the same garage door as the Mercedes Benz had, and the blue Tahoe left fifteen minutes later. Id. A Metro Nashville Police Department officer conducted a

7

traffic stop on the blue Tahoe, and "found the driver, Ronnie Collins Norman, to be in possession of approximately two kilograms of cocaine." Id.

On April 3, 2011, DEA intercepted telephone calls revealing that "Ferguson was supposed to meet with Reed to drop off drug proceeds." Id. at 26. Reed then went to Target Premises 1. Id. Telephone calls were then intercepted in which "Syed instructed Reed to count the money and that Gonzalez would be arriving soon." Id. That evening, Gonzalez arrived at Target Premises 1, and telephone calls "were then intercepted between Reed, Syed, and Gonzalez discussing amounts of money being counted and methods of transportation." Id. Based upon the events of April 3, 2011, the agents concluded that Reed was picking up drug proceeds, counting the proceeds, and then transporting the proceeds.

On April 6, 2011, two Hispanic males one of whom was suspected to be Gonzalez and possibly Medina, were observed at Target Premises 1, and left the garage area with the white Mercedes Benz. Id. Agents then followed the Mercedes to a parking lot, where the agents believed another co-conspirator was to pick up the Mercedes and "remove money from the vehicle." Id. Intercepted telephone calls "later in the day indicated that Gonzalez had detected law enforcement following him and grew scared," so no one picked up the Mercedes. Id. That evening, Syed called Reed and told him to "pick up the Mercedes and take it somewhere other than Target Premises 1." Id. at 27. "Calls were intercepted on the following days in which Syed stated that the money will still located within the vehicle." Id. Agents observed Reed drive the Mercedes to an apartment complex in Nashville, where the vehicle remained until April 11, 2011, "when Reed picked it up and took it to Target Premises 6." Id.

Powell's affidavit concluded that "Agents believe [the Defendant's residence] is a stash

8

house utilized by REED to store drugs and drug proceeds. REED has been seen there on multiple occasions during surveillance over the course of this investigation." Id. at 28. In fact, surveillance observed Reed at the Defendant's residence on five separate occasions between January 27, 2011, and March 21, 2011. On January 27, 2011, Agents observed Reed leaving the Defendant's residence to travel to Target Premises 6, Reed's primary residence. Id. On February 2, 2011, DEA agents observed Reed at the Defendant's residence that had cameras on the exterior of the residence. Id. Upon leaving the Defendant's residence, agents watched Reed travel to Target Premises 6, where Reed remained until the next day and left in a white Mercedes Benz. Id. The agents belief was that Syed's and Reed's use of the white Mercedes Benz, on February 2, 2011, and the earlier September 10, 2010 Atlanta visit was to transport cocaine from Atlanta to Nashville. Id. at 14.

The agents' other observations were the March 9, 2011 exchange of drug proceeds at Syed's restaurant; the March 25, 2011 transfer of a large amount of cocaine; the April 3, 2011 transport of drug proceeds; and the April 6, 2011 attempt to deliver drug proceeds. Id. at 19, 23, and 26. In addition, on February 21, 2011, the DEA intercepted telephone calls in which Syed pressured Reed to collect drug debts and Reed shortly thereafter contacted one of his customers to pick up money. Id. at 17. Reed met his customer at a gas station, where agents observed Reed depart in a Mercury Marauder that agents previously observed at the Defendant's residence. Id. at 18. During subsequent telephone conversations, Reed told Syed that he had "35, probably 40 . . . got about 30 something on me I know." Id. at 18. Powell interpreted Reed as stating "that he had between $35,000 and $40,000 in drug proceeds collected so far." Id. Three minutes later, in another telephone call, Reed told Syed that he would "get [his] end together." Id. Immediately

after that call, agents observed Reed drive to the Defendant's residence and enter. Id. Reed's gold Tahoe was in the Defendant's driveway when Reed arrived in the Marauder. Id. Ninety minutes later Reed left the Defendant's residence in his Tahoe. Id.

On March 11, 2011, agents intercepted telephone calls in which Syed told Reed to drop off drug proceeds at a truck stop to an unidentified Hispanic male who would transport the proceeds to co-defendant Aldo Villarreal. Id. at 20. Reed then called the truck driver to coordinate a time and place to meet. Id. Agents then observed "REED at Target Premises 4 [the Property] immediately prior to driving to the truck stop and meeting with two unidentified Hispanic males." Id.

On March 21, 2011, agents intercepted telephone calls in which Reed arranged to meet an unidentified male at a golf course. Id. at 21. During this conversation, Reed told the male to "leave it in the car," and the male told Reed to "just bring like just like one of them then," to which Reed responded, "okay, yeah ... just answer your phone man and I'll put it in your car." Id. Agents then observed Reed drive the white Mercedes Benz to the golf course, remove a package from another vehicle, and return to the Mercedes Benz at approximately 1:33 p.m. Id. at 21-22. Agents then followed Reed to the Defendant's residence. Id. According to Powell's affidavit, at approximately 2:35 p.m., just an hour after Reed picked up the package from his customer at the golf course, DEA agents observed Reed leave the Defendant's residence in the white Mercedes Benz to drive to Target Premises 9, to meet with Syed. Id. at 22.

After Reed's visit on March 21, 2011, up to and including April 12, 2011, wiretaps on the telephones of Reed and Syed were ongoing until April 14, 2011. Id. at 11. Based upon the ongoing interceptions of those two phones, Powell believed these crimes to remain ongoing. Id.

10

Id. at 27.

## 2. Search of Defendant's Residence

On April 18, 2011, DEA agents and task force officers as well as local law enforcement officers executed the search warrant for the Defendant's residence. At the time of the agents search, the Defendant and his girlfriend Daya Roberts, were in the residence. Upon their entry into the Defendant's residence, agents took the Defendant into custody and asked if he lived at this residence. The Defendant then asked about the kind of search warrant and Agent Jones responded, search warrant for drugs in the residence. In response to his counsel's question of whether the Defendant "spontaneously" told the agents of an "AR-15" in his residence, the Defendant responded yes. (Hearing Transcript at 30).

The agents' search of the Defendant's residence revealed: (1) a Cobra Enterprises .38 caliber Derringer in the dresser in the master bedroom; (2) an FNH USA 5.7 semi-automatic handgun, with a round in the chamber and 33 rounds in the magazine, in the master bedroom on the floor next to the bed; (3) seven 50 round boxes of 5.7 x 28 mm ammunition in the kitchen; (4) an FN 5.7 magazine loaded with 29 rounds of 5.7 ammunition in the living room couch; (5) the firearm that defendant referred to as an "AR-15" - a Kel-Tec semi-automatic short barrel rifle, Model PLR 16, 5.56mm, with a magazine containing 23 rounds of .223 ammunition inside a briefcase in the master bedroom on a dresser; and (6) a dual drum magazine, .223 caliber, on the master bedroom floor.

In various locations, inside this residence, the agents also found a bulletproof vest, two large sealed plastic bags containing marijuana, a baggie of marijuana, other small amounts of marijuana and a variety of pills that appeared to be ecstacy (MDMA). A very large number of

Ecstacy pills were inside the Defendant's freezer. As later determined by a DEA laboratory, there were approximately 1,800 Ecstacy pills in those two bags. The agents found a digital scale concealed as a compact disc, several cell phones, and $2,980 in cash.

As to his statements to agents during the search, the Defendant testified that as he was escorted at gunpoint from the residence outside to a patrol vehicle, he "spontaneously" told the agent about the AR-15. (Hearing Transcript at 30, 35). After seizure of $2,980 in cash and under DEA policy, Agent Jones requested the Defendant to be brought to the kitchen to sign the evidence envelopes for the seized cash. As the Defendant entered the kitchen, Jones was at the kitchen table documenting the inventory of evidence. The Defendant testified that once he was returned to the residence that the agent asked him "about some pills" and "what you [the Defendant] had been doing at the residence for the last three years." Id. at 29. The Defendant told the agent that he had lived there for eight moths. Id. at 29-30. The agent also asked the Defendant where he got the pills. Id. at 32. The Defendant who has had four or five prior occasions in 2003 or 2004 to receive Miranda warnings, testified that prior to these questions, the agents had not advised him of his Miranda rights. Id. The Defendant admits that he later went to a DEA office, but denied receiving any Miranda warnings. Id. at 33-34

According to a DEA agent, Jones asked the defendant to sign the evidence envelope with the $2,980 in cash and told the Defendant that agents had found Ecstacy in his residence. In response to Jones's statement, Defendant stated that he took Ecstacy. Jones then displayed two bags of a large number of Ecstacy pills from the Defendant's freezer and Defendant responded that he had bought "that," but declined to identify the seller of those pills for fear for his life, namely, "they" would kill him and his children. At the suppression hearing, the Defendant stated

12

that he "took" the pills, and the marijuana, digital scales and money at the residence belonged to him. Defendant explained that his girlfriend, Daya Roberts, was "not involved in any of this."

### 3. Defendant's Post-Miranda Statements

Prior to his initial appearance in this action and after the search of his residence, DEA agents brought the Defendant to the Nashville DEA office where DEA Agents Tanya Bilyeu and Jones advised the Defendant of his <u>Miranda</u> rights. After these <u>Miranda</u> warnings, the Defendant told the agents that he understood his rights and willingly waived them to speak with the agents. Agent Bilyeu then asked Defendant if the pills found in his freezer were, in fact, Ecstacy. Defendant stated they were. The agents did not question Defendant any further.

## C. Conclusions of Law

### 1. The Search Claims

In his motion to suppress, the Defendant contends: (1) that Powers's affidavit lacks facts to establish probable cause to search his residence; (2) that Power's affidavit failed to establish a sufficient nexus between the alleged criminal activity at the Defendant's residence; and (3) the information in Powell's affidavit is stale. Defendant, however, did not request a <u>Franks</u>[2] hearing, and does not suggest that the agents deliberately violated the Fourth Amendment.

A search warrant is valid if the "magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." <u>United States v. Leake</u>, 998 F.2d 1359, 1363 (6th Cir. 1993)(quoting <u>United States v. Pelham</u>, 801 F.2d 875, 877-78 (6th Cir.1986)). To decide that issue, the Court views the totality of the circumstances in assessing probable cause. <u>United States v. Greene</u>, 250 F.3d 471, 479 (6th Cir. 2001). A judicial determination of probable

---

[2] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

cause is entitled to "great deference." United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (en banc). The affidavit for a search warrant must show a nexus between the place to be searched and the evidence sought. United States v. Carpenter, 360 F.3d 591, 594 (6th Cir.2004) (en banc). Probable cause requires only a "fair probability, given the totality of the circumstances that contraband or evidence of a crime will be found at a particular place." United States v. Greene, 250 F.3d 471, 479 (6th Cir. 2001)(internal quotations omitted).

Defendant contends that the Government's showing for the search warrant lacked proof that "transport[ed] any item into or out of the residences." Powell's affidavit details a large-scale and an ongoing drug trafficking conspiracy involving Reed and numerous others, including the Defendant. The detailed facts include DEA agents' observations, and the agents' observations of co-defendant Reed's multiple visits to the Defendant's residence. Reed also left vehicles at the Defendant's residence and used Defendant's residence to store drugs. DEA agents observed Reed at the Defendant's residence five times over two months and the wiretaps revealed Reed's visits were immediately before or after Reed picked up or dropped off drug proceeds. Powell's affidavit is based upon that agents' actual observations and the intercepted telephone calls. The Court concludes that collectively the facts in Powell's affidavit establish probable cause for the presence of drugs at the Defendant's residence.

As to whether Powell's affidavit contains stale information, "[i]n seeking to establish probable cause to obtain a search warrant, the affidavit may not employ 'stale' information, and whether information is stale depends on the 'inherent nature of the crime.'" United States v. Spikes, 158 F.3d 913, 923 (6th Cir. 1998) (quoting United States v. Henson, 848 F.2d 1374, 1382 (6th Cir. 1988)). The Sixth Circuit also observed that in drug cases, evidence "goes stale

very quicky 'because drugs are usually sold and consumed in a prompt fashion.'" United States v. Brooks, 594 F.3d 488, 493 (6th Cir. 2010) (quoting United States v. Frechette, 583 F.3d 374, 378 (6th Cir. 2009)). Yet, in Frechette, the Sixth Circuit also observed that "information of an unknown and undetermined vintage relaying the location of mobile, easily concealed, readily consumable, and highly incriminating narcotics could quickly go stale **in the absence of information indicating an ongoing and continuing narcotics operation**." Frechette, 583 F.3d at 378 (quoting United States v. Kennedy, 427 F.3d 1136, 1142 (8th Cir.2005) (emphasis added).

Here, the facts reflect that the DEA agents had "information indicating an ongoing and continuing narcotics operation." Powell's affidavit cited CS-1's and Syed's travel to and from Atlanta, intercepted telephone calls involving Reed's and Syed's cell telephones, and the agents' observations of Reed from March 21 through April 12, 2011. These facts reflect that "the crimes being investigated [were] ongoing." (Docket Entry No. 413-1, Powell's Affidavit at p. 8). This ongoing drug trafficking conspiracy was observed as of April 12, 2011, two days before the issuance of the warrant for the search of the Defendant's residence.

"Where recent information corroborates otherwise stale information, probable cause may be found." United States v. Spikes, 158 F.3d 913, 924 (6th Cir. 1998) (quoting Henson, 848 F.2d at 1381-82); see also United States v. Helton, 314 F.3d 812, 822 (6th Cir. 2003) (emphasis in original) (where "the evidence of criminal activity . . . is the storage of drug money, the likely duration is relatively long"); United States v. Word, 806 F.2d 658, 662 (6th Cir. 1986) (holding that four-month-old information in an affidavit was not legally stale where there was evidence that a doctor's sale of drugs was "of a continuing nature").

For these reasons, the Court concludes that this drug trafficking conspiracy involving the Defendant was ongoing and continuous. The facts establish that the Defendant's residence was a

stash house for Reed, including on April 12, 2011. Thus, the Court concludes that Defendant's stale information contention lacks merit. For these collective reasons, the Court also concludes that the Defendant's motion to suppress the fruits of the search of his residence (Docket Entry No. 385) should be denied.

## 2. The Miranda Claims

Defendant also contends that the agents attained two incriminating statements from him at his residence without Miranda warnings. These questions and answers are: (1) Jones's question on whether the Defendant lived at the house searched and how long, to which the Defendant responded "yes" and eight months; and (2) Jones's showing the Defendant the two bags of pills from the freezer in the residence that the Defendant admitted belonged to him.

In sum, the two core elements of Miranda warnings are custody and interrogation that is likely to elicit incriminating statements. Oregon v. Mathiason, 429 U.S. 492, 495 (1977); Rhode Island v. Innis, 446 U.S. 291, 301 (1980). In Oregon v. Elstad, 470 U.S. 298, 316 (1985) the Supreme Court held that a defendant's response to an officer's brief question at the Defendant's residence while the other officer informed the defendant's mother of his arrest, did not constitute custodial interrogation for Miranda purposes because that brief questioning had "none of the earmarks of coercion." . Elstad's holding gave rise to what the Supreme Court later described as the "question first" tactic in which police officers secure a statement without Miranda warnings and then, later take a second statement with Miranda warnings. In Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court held the deliberate employment of the "question first" tactic without Miranda warnings to be a circumvention of Miranda and violative of Miranda's central concern about coercive police tactics.

Of the two core requirements for Miranda warnings, the first is custody that here is

16

undisputed. As to the interrogation element, routine on the scene questions as to name and addresses, "the booking exception", are not interrogation for Miranda purposes. Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990). Any question requiring a "yes" or "no" is not interrogation. United States v. Kellogg, 202 Fed. Appx. 96, 103 (6th Cir. 2006). Questions about a defendant's address at a drug seizure site have been held not to be "subject to the strictures of Miranda." United States v. Hernandez-Espolina, No. 06-CR-0203-CVE, 2007 WL 109157, at *6 (N.D. Okla. Jan. 9, 2007). Yet, where questions about residence go further as to the length of time at the residence and circumstances of residency, such questions are interrogation subject to Miranda. United States v. Pacheco-Lopez, 531 F.3d 420, 424 (6th Cir. 2008). In addition, where agents know that a residence contains large quantities of drugs, questions to a defendant about his residence is an interrogation for Miranda purposes, United States v. Disla, 805 F.2d 1340, 1347 (9th Cir. 1983), but such questioning without Miranda warnings does not warrant the exclusion of the "fruits" of the related search. United States v. Brinter, 985 F.2d 575 (5th Cir. 1973).

As to the admissibility of the Defendant's statement in response to being shown the bags of pills, Miranda applies not only to questions, but also to "actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 300-01. See also United States v. Green, 541 F.3d 176, 186-87 (3d Cir. 2008) (showing video of narcotics transaction invokes Miranda). Yet, "a spontaneous statement about ownership of drugs" is not barred by Miranda. United States v. Campbell, 609 F. Supp.2d 674, 641 (E.D. Mich. 2009).

With evidence of the prior surveillance showing substantial drug trafficking at the Defendant's residence, the Court concludes that the agents' questions about the Defendant's

length of time at the residence and the showing of the bags of pills are governed by Miranda and without Miranda warnings, the Defendant's statements at the residence must be suppressed. Pacheco-Lopez, 531 F.3d at 424. Given the brevity of the questions at the Defendant's residence and the other proof, the Court concludes that the agents did not deliberately employ the "question first" tactic and credits the agent's testimony that the Defendant was later given Miranda warnings and admitted to his possession of the ecstacy pills found at his residence. There is a time break between the two questionings at issue and such a time break is consistent with Elstad. See also Hoffner v. Bradshaw, 622 F.3d 487, 512 (6th Cir. 2010).

Thus, the Court concludes that Defendant's statements to the agents at the DEA office of his ownership of the pills should not be suppressed. By his own testimony, the Defendant's statement at his residence about the AR-15 weapon was "spontaneous" and should not be suppressed.

An appropriate Order is filed herewith.

ENTERED this the 28th day of November, 2012.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court